Veronica A. Procter
PROCTER LAW, PLLC
2718 Montana Avenue, Suite 200
P.O. Box 782
Billings, MT 59103
Telephone: (406) 294-8915
vp@procterlawfirm.com

*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BUTTE DIVISION

| | |
|---|---|
| JANE DOE NO. 3,<br><br>                Plaintiff,<br><br>*v.*<br><br>MONTANA STATE UNIVERSITY,<br><br>                Defendant. | Case No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## NATURE OF ACTION

1. This is a civil rights action brought under Title IX of the Education Amendments of 1972, as amended. Plaintiff Jane Doe No. 3[1] ("Ms. Doe No. 3") was raped by two fellow students while attending Defendant Montana State University ("MSU"). Subsequently, Ms. Doe No. 3 reported the rape to campus

---

[1] Jane Doe No. 3 is referred to as Jane Doe No. 3 to avoid confusion with Jane Doe Nos. 1 and 2, the plaintiffs in Case Nos. CV-19-54-BU-SHE and CV-20-00012-SEH, companion cases involving similar allegations and claims against MSU.

police. When campus police seemed unable or unwilling to pursue a reasonable investigation, Ms. Doe No. 3 made a report to MSU's Office of Institutional Equity ("OIE"). She was initially told the process would take approximately three months, but that she would have to wait for an investigator to be trained before the investigation would begin. After six months, there was still no resolution of her rape report, and OIE advised her to refrain from pursuing formal adjudication on the purported ground that Ms. Doe No. 3's allegation lacked sufficient corroborating evidence. During the lengthy and fruitless investigation of her report, Jane Doe No. 3 suffered from increased anxiety, for which she saw a counselor, and at one point attempted to drown herself in a swimming pool, all while her rapist remained an MSU student. OIE lacks sufficient resources and adequate training to meet its Title IX obligations. MSU's deliberate indifference and failure to take timely action in response to Ms. Doe No. 3's report violated its own policies and federal law. MSU acted with gender based discriminatory intent in failing to provide OIE with the resources needed to timely and effectively respond to complaints of sexual assault and harassment. As a result of its failure to comply with its Title IX obligations, MSU unreasonably interfered with Ms. Doe No. 3's access to educational programs at the University.

## PARTIES

2.      Plaintiff Jane Doe No. 3 is a current Montana State University student

who resides in Bozeman, Montana.

3. Defendant Montana State University is a public university located in Bozeman, Montana.

## VENUE

4. Jurisdiction over federal claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681-88 and under 42 U.S.C. §1988, which provide for attorney and expert fees for vindication of civil-rights claims, is asserted under 28 U.S.C. §§1331 and 1343.

5. The Court has personal jurisdiction over defendant and venue is proper here under 28 U.S.C. §1391 because the relevant events took place within this Court's jurisdiction.

## GENERAL ALLEGATIONS

### MSU Policies

6. Pursuant to MSU's Discrimination Grievance Procedures for Allegations of Violations of the Discrimination, Harassment, Sexual Misconduct, Dating Violence, Domestic Violence, Stalking and Retaliation Policy, OIE was to initiate and complete its investigations within forty (40) days.

7. The University Policies implicated in the investigations are as follows:

   a. 225.00 Sexual Misconduct

    i. "Consent" is defined as "an understandable exchange of affirmative words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity. Consent must be informed, freely and actively given.  If coercion, intimidation, threats or physical force are used there is no consent. There is no consent if a person is mentally or physically incapacitated so that such person cannot understand the fact of, or make a reasonable judgment as to, the nature, potential harmfulness of the conduct, or extent of the sexual situation.  This includes incapacitation due to mental disability, alcohol or drug consumption, or being asleep or unconscious. A person who knows or reasonably should have known that another person is incapacitated may not engage in sexual activity with that person.  There is not consent when there is force, expressed or implied, or use of duress or deception upon the victim,  in the absence of mutually understandable words of actions, it is the responsivity of the initiator or the person who wants to engage in the specific sexual activity, to make sure that he/she has the consent from his/her partner(s). Silence does not necessarily constitute consent. Past consent to sexual activities does not imply ongoing future consent.  Whether an individual has taken advantage of a position of influence over an alleged victim may be a factor in determining consent.

    ii. "Sexual Assault" is defined as "actual attempted sexual contact with another person without that person's consent." This includes, but is not limited to:…
- "Intentional and unwelcome contact with the breasts, buttock, groin or genitals or touching another with any of these body parts or coercing or forcing or attempting to coerce of force another to touch the perpetrator or themselves with or on any of these body parts."
- "Any other intentional bodily contact in a sexual manner, including contact by a penis, tongue or finger and oral copulation (mouth to genital or genital to mouth contact)
- "Sexual intercourse without consent, including acts commonly referred to as 'rape.'"

    iii. Sexual Exploitation/coercion occurs when a person takes non-

4

consensual or abusive sexual advantage of another for anyone's advantage or benefit other than the person being exploited, and that behavior does not otherwise constitute one of the preceding sexual misconduct offenses. Examples of sexual exploitation include:
- Prostituting another person;
- Non-consensual visual (e.g., video, photograph) or audio-recording of sexual activity;
- Non-consensual distribution of photos, other images, or information of an individual's sexual activity, intimate body parts, or nakedness, with the intent to or having the effect of embarrassing an individual who is the subject of such images or information;
- Going beyond the bounds of consent (such as letting your friends hide in the closet to watch you having consensual sex);
- Engaging in non-consensual voyeurism;
- Knowingly transmitting a sexually transmitted disease, such as HIV, to another;
- Exposing one's genitals in non-consensual circumstances, or inducing another to expose his or her genitals; and
- Possessing, distributing, viewing or forcing others to view illegal pornography.

b. 223 Sexual Harassment

  i. "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, including sexual misconduct," and "conduct that is sufficiently serious (i.e. severe, pervasive, or persistent) and objectively offensive so as to deny or limit a person's ability to participate in or benefit from the University's programs, services, opportunities, or activities;" or when such conduct has the purpose or effect of unreasonably interfering with an individual's employment or academic performance.

  ii. A serious incident, such as sexual assault, even if isolated, can be sufficient" in creating a hostile environment.

5

      c.  224 Hostile Environment

           i. "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, including sexual misconduct," and "conduct that is sufficiently serious (i.e. severe, pervasive, or persistent) and objectively offensive so as to deny or limit a person's ability to participate in or benefit from the University's programs, services, opportunities, or activities;" or when such conduct has the purpose of effect of unreasonably interfering with an individual's employment or academic performance

          ii. A serious incident, such as sexual assault, even if isolated, can be sufficient" in creating a hostile environment.

## The Rape and Investigation

8. In late August, 2017, Jane Doe No. 3 went to a party at a fraternity house for MSU students. At that party, Ms. Doe No. 3 drank alcohol to the point where one of her female friends told her it was time to go to bed. Ms. Doe No. 3 agreed.

9. Ms. Doe No. 3 planned to sleep in the fraternity's attic space, which is often used for guests and games. Ms. Doe No. 3 recalls falling asleep, but upon awakening, she noticed that she was naked and had been moved to a different part of the sleeping space. She also noticed that other mattresses had been pulled closer to hers. She was alone in the attic space when she awoke. She immediately dressed herself and left.

10. Subsequently, some friends of Ms. Doe No. 3 told her that two male

6

friends of hers (Student B and Student C) were with her that night and that they told other students that they had sexual intercourse with Ms. Doe No. 3 that night. Ms. Doe No. 3 recalls these two male students being in the attic space with her when she fell asleep. Ms. Doe No. 3 was aware that these students have a history of engaging in this sort of activity, and that Student B was currently under investigation by law enforcement for a different sexual assault.

11. Following this incident, Ms. Doe No. 3 began seeking services from the MSU VOICE center, a 24-hour confidential support line that provides free and confidential services and information for all people affected by sexual assault, relationship violence and stalking, including friends and family of survivors.

12. Ms. Doe No. 3 ultimately reported the incident to campus police and obtained no contact orders regarding the two male students. In response, the two male students contacted Ms. Doe No. 3 and invited her to "have coffee", but she refused the invitation.

13. During a meeting with police, police advised Ms. Doe No. 3 that they had no new evidence in her case and seemed to be waiting for Ms. Doe No. 3 to decide how far she wanted to pursue the incident. The police in effect advised Ms. Doe No. 3 that there was little they could do to move the case forward.

14. Campus police did not make an arrest.

15. Due to the inaction of campus police, Ms. Doe No. 3 decided to report

the rapes to OIE. Emily Stark of OIE assured Ms. Doe No. 3 that her case would be closed within three months. Emily Stark told Ms. Doe No. 3 that she would however have to wait for her case to be investigated because OIE was training the person who would handle the case. Emily Stark also advised that two other female students reported being raped by Student B.

16. Six months after this meeting, Ms. Doe No. 3's case had still not produced any results and Student B was still attending MSU without any disciplinary action being taken against him.

17. As time went on, Ms. Doe No. 3 began to suffer increased anxiety, and experienced pain and anguish over the possibility of being raped again. Ms. Doe No. 3 had previously been sexually assaulted in France and blamed herself for being assaulted again. She suffers from spontaneous bouts of crying and was frustrated by a lack of validation in the process.

18. Ms. Doe No. 3 suffered from psychological trauma as a result of OIE not taking any action to investigate her allegations.

19. Ms. Doe No. 3's two assailants were kicked out of the fraternity to which they belonged as a result of their sexual predation of women.

20. In November, 2017, Ms. Doe No. 3 sought to move her case forward with OIE and also met with other victims of rape perpetrated by the same two male students who raped Ms. Doe No. 3. One of these victims was Jane Doe No. 2 in

Case No. CV-20-00012-SEH currently pending before Hon. Sam Haddon. Ms. Doe No. 3 reported that she had "an overwhelming urge to tell [Ms. Doe No. 2] to not report, because the emotional stress that reporting caused [Ms. Doe No. 3], and multiple other victims who [Ms. Doe No. 3] know[s] reported, have not been worth it as [they] have not seen results."

21. On March 31, 2018, Ms. Doe No. 3 sent a letter to Waded Cruzado, the President of MSU. In the letter, Ms. Doe No. 3 stated that MSU "has continuously failed to promote equality and provide safety for its student[s] who have been victims of sexual assault." She noted further that OIE and other institutions "have promised outcomes to sexual assault victims who have gone through the emotional and mental draining process of reporting and have [been] unable to deliver any form of effective outcome."

22. Ms. Doe No. 3 further stated in her letter:

[T]his timeline is consistent with every case that I am aware of that was brought to the OIE, even though they promise a much shorter timeline. It is outrageous that I am writing this letter six months after reporting my assault and knowing that there are three other victims, two of whom have filed reports about the same perpetrator. It is sad and terrifying to know that these are only the ones victims of this particular perpetrator that I am aware of. I do not believe that we are the only ones though. And we are for certain not the only ones that have had to deal with the sluggish and ineffective bureaucracy of this university.

23. Ultimately Ms. Doe No. 3's case was never resolved because Emily Stark advised her to refrain from filing a formal complaint because, according to

9

Emily Stark, the evidence of student misconduct was insufficient. In fact, Emily Stark advised Ms. Doe No. 3 that if the "scales tipped" against her in the OIE investigation and it was found that Ms. Doe No. 3 violated the code of conduct against her alleged perpetrators, Ms. Doe No. 3 could suffer adverse action by OIE. This was especially alarming to Ms. Doe No. 3 considering if she was suspended or expelled from MSU, she would be deported to Brazil.[2] Emily Stark knew of her citizenship status at the time she dissuaded her from filing a formal complaint.

24.     At some point Emily Stark provided Ms. Doe No. 3 with the name of another sexual assault victim. This other victim was upset upon learning that Ms. Doe No. 3 knew that she had been raped and wanted to know how Ms. Doe No. 3 acquired this information. However, Emily Stark pressured Ms. Doe No. 3 to refrain from telling this other victim that she acquired the information from OIE, presumably out of concern that OIE violated this student's confidentiality concerns.

25.     The rape and OIE's failures to provide immediate, effective remedial steps to resolve the complaint of sexual assault caused Ms. Doe No. 3 serious emotional distress, adversely impacting her sense of personal safety, ability to focus on academic and other work at MSU, and her overall sense of well-being.

---

[2] Ms. Doe No. 3 had not lived in Brazil for almost 10 years, but rather the United States.

# CLAIM 1

## Sex Discrimination under Title IX of the Education Amendments 1972, 20 U.S.C. §§ 1681-88 – Sexual Harassment/Assault, Deliberate Indifference

26. Plaintiff incorporates all previous allegations.

27. Title IX prohibits sex discrimination by recipients of federal education funding.

28. MSU agreed to comply with all applicable federal statutes relating to nondiscrimination by recipients of federal financial assistance.

29. MSU had notice when it accepted federal funding under Title IX that the institution would be liable for intentional sex discrimination and deliberate indifference to sexual harassment.

30. Pursuant to Title IX, a student may bring a private action against a federal education funding recipient, such as MSU, for the recipient's deliberate indifference to sexual harassment of a student by another student.

31. MSU created and/or subjected Ms. Doe No. 3 to a hostile educational environment in violation of Title IX because:

    a) Ms. Doe No. 3 is a member of a protected class;

    b) Ms. Doe No. 3 was subjected to sexual harassment in the form of a sexual assault by another student;

    c) Ms. Doe No. 3 was subjected to harassment based on her sex; and

      d) Ms. Doe No. 3 was subjected to a hostile educational environment created by MSU's failure to properly investigate and/or address the sexual assault and subsequent harassment.

32. Sexual assault and rape are the most vicious forms of sexual harassment.

33. Student B and Student C's rape of Ms. Doe No. 3 constitutes sex-based harassment. Student B and Student C's conduct, and the subsequent psychological effect it had on Ms. Doe No. 3, was so severe, pervasive, and objectively offensive that it deprived Ms. Doe No. 3 of access to educational opportunities or benefits provided by the school.

34. Ms. Doe No. 3's report to campus police and OIE gave MSU actual notice of Student B and Student C's sexual assault, which was gender based.

35. OIE and campus police were the appropriate channel at MSU for purposes of reporting Ms. Doe No. 3's Title IX complaint.

36. MSU was in a position to vindicate Ms. Doe No. 3's rights.

37. MSU had authority to address the discrimination.

38. MSU had authority to institute correction measures.

39. MSU exercised substantial control over both the harassers, Student B and Student C, and the context in which the harassment occurred, as Student B, Student C, and Ms. Doe No. 3 were students of MSU subject to MSU's policies

and procedures.

40. Ms. Doe No. 3 expected MSU to act in accordance with the law.

41. Ms. Doe No. 3 expected MSU to act in accordance with university policy.

42. MSU failed to take immediate, effective remedial steps to resolve the complaint of sexual harassment, and instead acted with deliberate indifference towards Ms. Doe No. 3.

43. MSU's deliberate indifference and failure to take timely action in response to Ms. Doe No. 3's report violated its own policies and federal law.

44. MSU acted with gender based discriminatory intent in failing to timely and reasonably respond to her complaints.

45. MSU failed to follow its own sexual harassment policy in response to Ms. Doe No. 3's Title IX complaint that she was raped.

46. MSU's failure to promptly and appropriately respond to the alleged sexual harassment resulted in Ms. Doe No. 3, on the basis of her sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in MSU's education program in violation of Title IX.

47. As a direct and proximate result of these unlawful acts, Ms. Doe No. 3 has suffered and will continue to suffer economic and noneconomic damages in an amount to be determined at trial.

## CLAIM 2

## Sex Discrimination under Title IX of the Education Amendments 1972, 20 U.S.C. §§ 1681-88 – Official Policy/Custom of Discrimination

48. Plaintiff incorporates all previous allegations.

49. Ms. Stark advised Ms. Doe No. 3 that she would have to wait for an investigator to be trained prior to beginning to investigate her case. Ms. Stark then advised Ms. Doe No. 3 many months after she made her report to refrain from pursuing a formal process with the OIE because, in Ms. Stark's opinion, Ms. Doe No. 3 lacked sufficient evidence to support her claim.

50. Ms. Stark's actions in dissuading a rape victim from pursuing justice and validation demonstrates inadequate or improper training, lack of comprehension of basic evidentiary principles, such as the evidentiary value of circumstantial evidence, and/or imposition of a burden of proof standard that in practice exceeds even the proof beyond a reasonable doubt standard applied by criminal courts.

51. The inadequate resources allocated to the investigation of Ms. Doe No. 3's case, resulting in a flawed process that was both drawn out and inadequate to protect female MSU students from sexual harassment and assault from male students, was not an isolated incident. Rather, the inadequate handling of Ms. Doe No. 3's case was part of an official custom or policy of committing insufficient

resources towards protecting female MSU students from the most severe forms of gender-based discrimination.

52. In another case involving a similar failure to provide immediate, effective remediation for victims of sexual assault, OIE admitted to having inadequate resources and staffing to handle its caseload, stating in the final report:

> In her response to the DRAFT Report of Findings, the Complainant inquired about the timeline for the investigation. While every case presented within the Office of Institutional Equity is important, because of the extreme volume of cases and other staffing issues, cases with active students are prioritized over those where students have withdrawn from the University. In this case, the Complainant withdrew (October 16, 2018) prior to the Investigator even being able to meet with the Respondent (October 23, 2018).

53. Other female students who have been victims of sexual harassment and assault have similar experiences with the OIE. The OIE's case processing time routinely takes many months to complete due to inadequate staff and resources, effectively re-victimizing women by failing to provide immediate, effective remediation.

54. The foregoing allegation is supported by the similar experiences rape victims had as detailed in the complaints filed in Case Nos. CV-19-54-BU-SHE and CV-20-00012-SEH, and by the stories of other victims with whom Ms. Doe No. 3 communicated.

55. The OIE's investigations and fact-finding process are grossly inadequate, leading to indefensible conclusions in addition to the delayed

15

processing times. The OIE has concluded that no rape occurred when the evidence of rape is overwhelming, and has failed to impose sanctions or imposed ineffectual sanctions not commensurate with the nature of the offense at issue.

56. MSU engaged in a pattern and practice of behavior designed to discourage and dissuade students and guest students who had been sexually assaulted from seeking prosecution and protection and from seeking to have sexual assaults fully investigated, and actively dissuaded Ms. Doe No. 3 from seeking formal adjudication of her case.

57. Additionally, OIE failed to respect the confidentiality of rape victims, instead disclosing the identity of rape victims who did not wish to have their identities disclosed to other rape victims. The casualness with respect to which this was done in Ms. Doe No. 3's experience indicates it was not an isolated incident.

58. Based on the foregoing and the failure to provide a timely and reasonable response to Ms. Doe No. 3's rape report, it is apparent that MSU has an official policy and/or custom of underfunding, understaffing, and/or inadequately training the OIE, of deprioritizing cases involving the most severe forms of denial of access to educational opportunities or benefits provided by the school, of imposing an unreasonably high burden of proof on alleged victims of sexual assault, of dissuading sexual assault victims from making formal complaints, and/or of disregarding the privacy and confidentiality of rape victims. These

official policies and/or customs result in MSU's inability and/or unwillingness to take immediate, effective remedial steps to resolve complaints of sexual harassment and/or assault.

59. Due to these official policies and/or customs, reasonable students in Ms. Doe No. 3's circumstances would be, and in fact were, chilled from reporting sexual harassment.

60. MSU adopted and applied these official policies and/or customs with discriminatory intent.

61. Women are disproportionately victimized by sexual misconduct, sexual harassment, and sexual assault, and men are disproportionately the perpetrators. See *Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1225 (D. Or. 2016), a*ff'd by Austin v. Univ. of Or.,* 925 F.3d 1133, 1139 (9th Cir. 2019) ("[i]t is a simple fact that the majority of accusers of sexual assault are female and the majority of the accused are male, therefore enforcement is likely to have a disparate impact on the sexes.")

62. MSU's budgeting decisions regarding OIE MSU's budget decisions "reflect[] [it's] judgment and priorities." See *Cmty. Pharmacies of Indiana, Inc. v. Indiana Family & Soc. Servs. Admin. & Its Subdivision*, 816 F. Supp. 2d 570, 574 n.2 (S.D. Ind. 2011) ("the budget bill reflects the judgments and priorities of the legislature") (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 55-56 (1998)).

63. MSU knew in allocating resources and implementing policies regarding the OIE and Title IX compliance that these decisions would have disparate impacts on women and proceeded to deliberately underfund the OIE with the knowledge and intent that women would be harmed by the decision.

64. These policies and/or customs constitute intentional discriminatory treatment of females and have had a discriminatory and disparate impact on female students. It can reasonably be inferred from MSU's conduct that gender is a substantial or motivating factor behind MSU's discriminatory policies and/or customs described herein.

65. MSU's intentional discrimination is further evidenced by the fact that its deliberate underfunding of the OIE has had a disparate impact on female students. See *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 265 (1977) (noting that disparate impact "is not irrelevant" to proving intentional discrimination); *Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007) (discriminatory acts towards third parties may be used to show actions taken against the plaintiff were motivated by discrimination); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 860 (9th Cir.2002) (en banc), *aff'd*, 539 U.S. 90 (2003) (noting that motive can "in some situations be inferred from the mere fact of differences in treatment" (internal quotation marks omitted)).

66. In addition to its Title IX violations in response to Ms. Doe No. 3's

complaint of sexual harassment and assault, MSU violated Title IX through its intentionally discriminatory official policies and/or customs.

67. As a direct and proximate result and natural consequence of these unlawful acts, Ms. Doe No. 3 has suffered and will continue to suffer economic and noneconomic damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

A. Declare that Defendant's acts and conduct constitute violations of federal law;

B. Enter judgment in Ms. Doe No. 3's favor as to claims 1 and 2;

C. Award Ms. Doe No. 3 full compensatory damages, economic and non-economic, including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that Ms. Doe No. 3 has suffered and is reasonably certain to suffer in the future;

D. Award Ms. Doe No. 3 pre-judgment and post-judgment interest at the high lawful rate;

E. Award Ms. Doe No. 3 her reasonable attorneys' fees (including expert fees), and all other costs of this suit.

F. Enter a permanent injunction requiring MSU to comply with its Title IX obligations to refrain from sex discrimination by mandating actions including, but not limited to, adequately training, funding, and staffing the OIE so as to enable MSU to take immediate, effective remedial steps to resolve all complaints of sexual harassment and/or assault.

G. Award all other relief in law or equity to which Ms. Doe No. 3 is entitled

and that the Court deems equitable just, or proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable in this action.

DATED this 6th day of July.

                     By:    /s/Veronica Procter
                             Veronica A. Procter
                             PROCTER LAW, PLLC
                             *Attorney for Plaintiff*